## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **ERIC NOVESHEN** | : | |
| **Plaintiff,** | : | **CASE NO. 13-61535-CIV-MARRA** |
| **vs.** | : | |
| | : | |
| **BRIDGEWATER ASSOCIATES, LP,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

### FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

The Plaintiff, ERIC NOVESHEN, *Pro Se* (hereinafter, "Noveshen" or the "Plaintiff"), files this, his first amended complaint (this "Amended Complaint") against Defendant Bridgewater Associates, LP (hereinafter, the "Defendant") and alleges as follows:

### INTRODUCTION

1.    This is a civil action seeking declaratory relief of non-infringement of trademarks.

2.    At issue is the ability of websites that incorporate trademarked terms in their domain names and titles, signifying their particular company, product or service. U.S. federal trademark law principles recognize this as a species of fair use.

3.    By the Plaintiff seeking declaratory judgment pursuant to the federal Declaratory Judgment Act that Plaintiff's registration and use of the domain names <bridgewaterfunds.com>, <bridgewaterfund.com>, <bridgewaterfunds.net>, <bridgewaterfunds.biz>, and <bridgewaterfunds.org> (collectively the "Domain Names") does not constitute trademark infringement, unfair competition, or a

COURT_BWC #2013-0715 – COMPLAINT

violation of the Anti-cybersquatting Consumer Protection Act ("ACPA"'), and that Plaintiff is the rightful registered name holder or registrant of the Domain Names.

4.    Defendant have previously instituted arbitration proceedings before the World Intellectual Property Organization ("WIPO") whereby the arbitrator misapplied    established    federal    law    and    erroneously    ordered    the <bridgewaterfunds.net>,    <bridgewaterfunds.biz>,    and    <bridgewaterfunds.org> (hereinafter the "Transferred Domains") domains be transferred to the Defendant. The Plaintiff is seeking reversal of the WIPO decision.

5.    Defendant, which claims ownership of the "bridgewater" trademark, has threatened the Plaintiff with legal action for trademark infringement and instigated legal proceedings to have the Domain Names transferred from the Plaintiff to the Defendant. In light of established U.S. trademark law principles, however, Plaintiff's use of the word "bridgewater" is entirely lawful.

6.    Plaintiffs therefore seek a declaration that the use of "bridgewater" in connection    with    the    Top-Level    domains    <bridgewaterfund.com>    and <bridgewaterfunds.com> (the "TL Domains"), including in any website, is entirely lawful and does not infringe any of Defendant's trademark rights.

## PARTIES

7.    Plaintiff, Eric Noveshen, a natural person, resides in Fort Lauderdale, Florida.

8.    Upon information and belief, Defendant Bridgewater Associates, LP, a Delaware limited partnership, is based in Westport, Connecticut and operates as an investment advisor, operates websites that point to <bwater.com> and under the under "bridgewater"-keyword related trademarks.

9.    Upon information and belief, Raymond Dalio, a natural person, resides in Connecticut and is the President, managing partner or the majority owner of Bridgewater Associates, LP.

## JURISDICTION AND VENUE

10.    Pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §§ 220 1 (a) and 2202, Plaintiff seeks a declaration and judgment regarding its rights and obligations in an actual controversy within this Court's jurisdiction concerning Plaintiff's rights in and to the Domain Names. Subject matter jurisdiction exists in this case pursuant to 28 U.S.C. § 1331, giving this Court original jurisdiction in a civil action raising a federal question under 28 U.S.C. § 1338(a), the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and the ACPA, 15 U.S.C. § 1125(d), giving this Court original and exclusive jurisdiction in a civil action arising under the trademark and cybersquatting laws of the United States.

11.    This Court has supplemental jurisdiction over Plaintiff's state and common law claims pursuant to 28 U.S.C. § 1367(a), because they form part of the same case and controversy and derive from a common nucleus of operative facts.

12.    This Court has personal jurisdiction over the Defendant as they are doing business in Florida, engaged in business activities directed to Florida, committing a pattern of tortious conduct in Florida, using personal property in Florida as a means of perpetrating that conduct, and purposefully availing themselves of the opportunity to conduct commercial activities in Florida. Defendant has purposefully availed itself to this forum through general business presence and by filing of a Uniform Domain Name Dispute Resolution Policy ("UDRP") arbitration complaint against Plaintiff which resulted in the transfer of the Transferred Domains to Defendant.

13.    Venue is proper in this judicial district pursuant to Title 28 U.S.C. Section 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this district. Venue is also proper in this judicial district pursuant to Title 28 U.S.C. Section 1391(b)(2) because the property that is the

COURT_BWC #2015-0220 – FIRST AMENDED COMPLAINT

subject of this action is situated in this district, given that that registrar of the Domain Names is located in Fort Lauderdale, Florida, and that as discussed below, Defendant made knowing and material misrepresentations which the arbitrator relied upon in its decision to transfer the Transferred Domains in the UDRP arbitration proceeding filed by Defendant.

## FACTS GIVING RISE TO THIS ACTION

### Bridgewater Capital Ltd., Bridgewater Associates, LP, and the use of <bridgewaterfund> and <bridgewaterfunds>

14.  Plaintiff established Bridgewater Capital Ltd. (hereinafter the "Fund") on or about April 10, 2006.

15.  Thereafter, on May 1, 2006, Plaintiff established the TL Domains <bridgewaterfunds.com> and <bridgewaterfund.com>.

16.  The Fund is a small Bermuda registered mutual fund designed to provide *bridge* capital or short term loans directly to small publicly traded and private companies via the purchase of promissory notes and secured asset-based lending.

17.  Plaintiff has owned the TL Domains since 2006 and the Transferred Domains from 2011 until such time as the Transferred Domains were ultimately ordered to be transferred to the Defendant, per the WIPO decision, in November 2012.

18.  Plaintiff maintains that the Plaintiff has a legitimate interest in the TL Domains and Transferred Domains, and has used all of the Domain Names in various non-infringing manners such as emails and the delivery of information for approximately seven years without any bad faith towards Defendant.

19.  Upon information and belief, Defendant Bridgewater Associates, LP

COURT_BWC #2015-0220 – FIRST AMENDED COMPLAINT

is a registered investment advisor providing the management of financial investment portfolios of "global fixed income and currency management" for "institutional clients, including foreign governments and central banks, corporate and public pension funds, university endowments and charitable foundations."[1]

20.     Based on newly obtained information of the Defendant Bridgewater Associates, LP, the Defendant *manages* three (3) unregistered private offerings: *Pure Alpha, All Weather,* and *Pure Alpha Major Markets*.

21.     These unregistered offerings utilize "a global macro investing style based on economic trends, such as inflation, currency exchange rates, and U.S. gross domestic product."[2]

22.     None of the products offered by the Defendant contains the purported trademark "bridgewater."[3]

23.      None of the products offered by the Defendant are in the business of asset based lending to small public or private companies.

24.     The Defendant has never established registered any trademark rights in the trademark or relating to the domain name in dispute in Bermuda prior to the Plaintiff registering the Fund.

25.     The Plaintiff was not aware of Defendant's business or the trademark in dispute when the Plaintiff established the Fund and when the TL Domains <bridgewaterfund.com> and <bridgewaterfunds.com> were originally registered.

26.     Plaintiff's use of the Domain Names and the Fund is in a segment of the financial industry which is so categorically different than Defendant's use.

---

[1] http://www.bwater.com
[2] http://en.wikipedia.org/wiki/Bridgewater_Associates
[3] Plaintiff contends the dispute surrounding "bridgewater" is a "servicemark," and Defendant believes "bridgewater" is a "trademark." As succinctly stated by this Honorable Court, "a servicemark differs from a trademark only in that a servicemark identifies services rather than goods," and the infringement standards are essentially the same. *Murphy v. Provident Mut. Life Ins. Co. of Philadelphia*, 923 F.2d 923, 927 (2d Cir. 1990). For the sake of uniformity, the Plaintiff will refer to the disputed mark "bridgewater" as a trademark or mark hereinafter.

27.     The Plaintiff's legitimate interests in the operation of a hedge fund support a conclusion that the Plaintiff registered the TL Domains <bridgewaterfund.com>, <bridgewaterfunds.com>, and the Transferred Domains with the good faith intent to use the name in connection with Fund's objectives.

### The Prior Dispute

28.     On September 12, 2012, the Plaintiff received a Notification of Complaint (the "UDRP Complaint") and the Commencement of Administrative Proceeding from the WIPO Arbitration and Mediation Center (the "Center") by e-mail informing the Plaintiff that an administrative proceeding had been commenced by the Defendant in accordance with the Uniform Domain Name Dispute Resolution Policy (the "Policy"), approved by the Internet Corporation for Assigned Names and Numbers ("ICANN") on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), approved by ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

29.     In the UDRP Complaint, the Defendant alleged that the Transferred Domains were confusingly similar to its "bridgewater" trademark. The UDRP Complaint demanded that the Transferred Domains be transferred to Defendant. A copy of the UDRP Complaint is attached as <u>Exhibit A</u>.

30.     On October 1, 2012, the Plaintiff filed his Response (the "Response") to the Defendant's UDRP Complaint and requested the Panel to deny the remedy requested by the Plaintiff.  A copy of the Response is attached as <u>Exhibit B</u>.

31.     In a showing of bad faith, on October 17, 2012, the Defendant filed a Supplemental Filing in a clear attempt to unfairly sway the arbitrator in the case which was a violation of the Rules.  Pursuant to the Rules, the Defendant are not allowed to make such filings and typically viewed as an unfair advantage or

"second bite at the apple" in such disputes. The UDRP Complaint must have been denied on the Defendant's misconduct alone. A copy of the supplemental filing is attached as Exhibit C.

32.     Accordingly, the Plaintiff filed his objections to the arbitrator. A copy of the Plaintiff's objections is attached as Exhibit D.

33.     On October 22, 2012, the arbitrator was unfairly swayed by the Defendant's machinations and ordered the transfer of the Transferred Domains from the Plaintiff to the Defendant. A copy of the order is attached as Exhibit E.

34.     The arbitrator's decision on October 22, 2012, misapplied current United States Federal Law and the Plaintiff seeks restitution by this Honorable Court.

### The Present Dispute

35.     On or about June 21, 2013, the Defendant sent a letter claiming that the Plaintiff's ownership of <bridgewaterfund.com> and <bridgewaterfunds.com> was infringing on certain a trademark owned by the Defendant. A copy of the order is attached as Exhibit F.

36.     In bad faith, the Defendant now seek the transfer of the ownership of the Plaintiff's interest in the <bridgewaterfunds.com> and <bridgewaterfund.com> domain names. [See Exhibit F]

37.     On this basis, Defendant have asserted a meritless basis for seeking a legal claim against Plaintiff's rightful property, the Domain Names, and an adverse decision by the Center, has created an actual case and controversy ripe for adjudication by this Honorable Court.

38.     Plaintiff seeks to bar the transfer of the <bridgewaterfunds.com> and <bridgewaterfund.com> domain names to Defendant and the rightful return of the Transferred Domains back to the Plaintiff.

39.     This action also seeks relief for Defendant's bad faith actions constituting tortuous acts against the Plaintiff.

### Facts Common to All Counts

40.     Domain Names are Internet Protocol addresses that point and direct Internet users to their desired destination. Owners of domain names possess valuable rights in domain names registered to them. Financial and related services and the related websites are legitimate and important multi-trillion dollar industry.

41.     Over the past two decades, overreaching trademark owners have sought to capitalize on this thriving market by using weak marks and generic terms registered as marks for their dictionary meanings to take advantage of the domain name dispute arbitration administrative system set up by ICANN (the California corporation that administers the Domain Name System ("DNS")), by filing arbitration legal proceedings to take valuable descriptive, generic, geographic, keyword and/or dictionary domain names away from their rightful owners. These abusive filings under ICANN's Policy are increasing as they continue to threaten existing and future development of domain name and business related expansion.

42.     In the instant matter, the Defendant, who purports to own the trademark "bridgewater," filed an UDRP Complaint proceeding against Plaintiff regarding the intellectual property of the Transferred Domains. In the UDRP Complaint, Defendant alleged that, despite using the TL Domains <bridgewaterfund.com> and <bridgewaterfunds.com> domain names for approximately six years for business purposes, Plaintiff has no rights or legitimate interests in the Transferred Domains and has registered and used it in bad faith, in a manner likely to confuse consumers as to the source of Defendant's services. Defendant sought an order from the arbitration directing the transfer of the Transferred Domains to Defendant, thus mandating the taking from Plaintiff of his

rightful property.

43.     The Defendant's statements in the UDRP were false, intentionally misleading and published.

44.     The Defendant was successful in the UDRP proceedings and under the provisions of the UDRP, the Transferred Domains were inevitably transferred to the Defendant.

45.     Due to the nefarious acts, the Defendant's false and misleading statements, undertaken by the Defendant and the misapplication of prevailing case law, the Plaintiff seeks this Honorable Court to overturn the WIPO decision dated October 22, 2012.

46.     Plaintiff registered the TL Domains in good faith in September 2006 and the Transferred Domains in March 2011.

47.     There are sixty-eight (68) trademark records before the United States Patent and Trade Office ("USPTO") for the term "bridgewater" related marks in various industries.

48.     Just because the Defendant was awarded the mark "bridgewater," the Patent and Trademark Office's registration of said mark is not conclusive.

49.     In 2006, the Plaintiff registered his hedge fund Bridgewater Capital Ltd. in Bermuda and relied on counsel that there were no similar or like registrations that would cause any confusion with the Plaintiff's registration.

50.     Further, before Plaintiff registered the TL Domains, the Plaintiff relied on the fact that generic geographic terms could never be used as trademarks for their related meanings no matter how much trademark registrants assert the opposite position.

51.     After registering the Domain Names, Plaintiff used the Domain Names for email and communication purposes.  The Plaintiff never set up a formal website nor did the Plaintiff advertise his services.

COURT_BWC #2015-0220 – FIRST AMENDED COMPLAINT

52.     Plaintiff is currently using the Domain Names for email and informational purposes and intends to continue to do so.

53.     Plaintiff did not register the Domain Names with the intent to sell it to Defendant nor did Plaintiff register or use the Domain Names to disrupt the Defendant's business, nor did Plaintiff register the Domain Names to confuse consumers trying to find the Defendant'' website.

54.     At all times material, the Plaintiff has never received any correspondence or customer mistaking the Plaintiff's services for those offered by the Defendant.

55.     Defendant entered evidence along with the UDRP Complaint in which one or both of Defendant or their agents self-generated which the Defendant knew were fraudulent in their presentation.

56.     Upon information and belief, Defendant, or their agent, manipulated the information displayed in response to Internet searches and the landing page for the Transferred Domains then used the advertisement shown on Plaintiff's webpage to self-generate evidence purporting to show evidence in support Defendant's claim of Plaintiffs bad faith registration and use of the Domain Names, something the Defendant could not show absent fabricating this evidence. Plaintiff did not cause any advertisements on the Transferred Domains to be reachable on the webpage shown, rather Defendant or their agents did by paying to put advertising links on the web page.

57.     Defendant materially misrepresented the nature of the Plaintiff's web page / site by presenting a "true and correct copy" of the Plaintiff's web page as an exhibit to its UDRP Complaint while altering the web page with their own actions to make the web page on the Transferred Domains to appear to be suggesting that it redirected visitors to other websites for profit.

58.     The Defendant and Raymond Dalio, including their agents, with

scienter, schemed to harm the Plaintiff and the Fund's business relationships.

59.     In 2006, the Fund set up and maintained a business relationship and bank account with JP Morgan.

60.     From 2010 to the present (which is well after the Plaintiff set up the Fund), the Defendant obtained significant assets under management thereby becoming one of the largest money managers in the world.

61.     In August 2012 which is over six (6) years *after* the Fund was established, the Defendant, Raymond Dalio, including their agents, learned of the Fund and the existence of the Fund's bank account.

62.     Certain employees of the Defendant and Raymond Dalio were even witnessed by the Plaintiff viewing the Plaintiff on LinkedIn which is a social networking website for professionals.

63.     Using their newly found influence and power in the investment community, the Defendant, Raymond Dalio, including their agents, contacted JP Morgan and inquired as to the Fund any bank accounts held with JP Morgan.

64.     For fear of risking the relationship with the Defendant and Raymond Dalio, JP Morgan instructed the Fund's administrator that JP Morgan would no longer be able maintain an account for the Plaintiff and the Fund. A copy of the email is attached as Exhibit G.

65.     From 2006 until the time that the Defendant, Raymond Dalio, including their agents, learned of the Fund and its bank account, the Plaintiff and the Fund enjoyed a business relationship with JP Morgan and never had any issues with their contractual relationship.

66.     The Defendant and Raymond Dalio have systematically prevented the Plaintiff from setting up any new bank account for the Fund which is ongoing.

### Defendant's Actions Before the USPTO

Page **11** of 25

67.    To fully understand the Defendant's position on their trademark, Plaintiff points out that the Defendant was originally "refused registration of the [Defendant's] mark" by the United States Trademark Office because the Defendant filed an application for a mark very similar to an existing mark. The Defendant explained in their response to the U.S. Patent and Trademark Office's Examining Attorney, *inter alia*, distinctions between the parties and elaborated on the significance of Complainant's clientele whom are solely comprised of **sophisticated and accredited investors**[4]:

> "[Defendant] also wishes to emphasize that the cited Registrant's and [Defendant's] clients are *generally sophisticated and knowledgeable customers*. Adopting a complex, custom-made and expensive motivation program, or committing to a new investment undertaking involving, e. g., corporate assets, credit union funds or employee retirement accounts, *are decisions which are not made lightly*. The fact that consultants are employed for guidance and assistance is *indicative of the seriousness with which these decisions are made*...**These decision-makers are certainly sophisticated enough to accurately discern the differences in the service marks of the potential consultants they are considering.**" [See Annex 3 page 3 to the Response] (emphasis added)

68.    At all times material, both the Plaintiff and the Defendant operate under specific regulations that ban the use of general solicitation and/or general advertising applicable to unregistered offerings as each party to this dispute is precluded by the United States federal securities laws from publicly advertising to

---

[4] There are eight categories of "accredited investor" set forth in Rule 501(a), Regulation D's definitional rule, along with a "catch-all" that brings within this defined term "any person ... who the issuer reasonably believes comes within" any of the enumerated categories at the time of sale. Five of the eight enumerated categories are focused exclusively on institutional investors, while only two refer expressly to "natural persons" or individual investors – Rule 501(a)(5)(individual or joint net worth, with a spouse, of more than $1 million, excluding the value of the primary residence) and Rule 501(a)(6)(annual income in each of the two preceding fiscal years exceeding $200,000 – or combined income with a spouse in excess of $300,000 for each such year, and a reasonable expectation of reaching the same level in the current year).

the public.

69.     At all times material to this Amended Complaint, the Fund has never advertised its services nor sought to obtain any other investor other than accredited investors.

### Established Law at Bar

70.     Private investment funds (including private equity, hedge funds and venture capital funds) rely on two primary exclusions from the definition of "investment company" subject to registration under the Investment Company Act – Section 3(c)(1) for private funds with fewer than 100 beneficial owners, and Section 3(c)(7) for private funds whose beneficial owners are "qualified purchasers." Both exclusions are conditioned upon the private fund not engaging, or proposing to engage, in a public offering of its securities to attract investors. [See Annex 17 to the Response] As each party is restricted in its ability to make public communications to attract investors and limited to only accredited investors, by the Complainant's own analysis, there can be no "probability of confusion." [See Annex 3 page 5-6 to the Response]

71.     Both U.S. Courts and the Patent and Trademark Office have held that similar or identical marks do not necessarily create a likelihood of confusion merely because they exist in the same broad industry.[5]

72.     Succinctly stated in the Defendant's response to the Trademark

---

[5] See, ***Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,*** 104 F.Supp. 2d 427, 467-68 (D.N.J. 2000), *affirmed in* 269 F.3d 270 (3d Cir. 2001) (no likelihood of confusion between identical marks used for goods that were both in the broad field of corporate security); ***In re Digirad Corp.,*** 45 U.S.P.Q. 2d 1841 (T.T.A.B. 1998) (DIGIRAY and DIGIRAD for medical diagnostic equipment not confusing); ***Clayton Mark & Co. v. Westinghouse Elec. Corp.,*** 356 F.2d 943 (C.C.P.A. 1966) (MARK for electrical conduit not likely to cause confusion with MARK 75 for industrial circuit breaker); ***Knaack Mfg. Co. v. Rally Accessories, Inc.,*** 955 F. Supp. 991 (N.D. Ill. 1997) (WEATHER GUARD and WeatherGUARD for motor vehicle accessories not confusingly similar).

Office's Examining Attorney, "[i]t is well established that the standard for "likelihood" of confusion equates with the <u>probability</u> of confusion, and not the mere "possibility" of confusion. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 49 U.S.P.Q.2d 1481 (3rd Cir. 1999)" [See Annex 3 pages 5-6 to the Response] (emphasis in the original) Nevertheless, the mark "bridgewater" has no secondary meaning and is not immediately descriptive of the Defendant's products or services.  Rather, the *generally sophisticated and knowledgeable customers* must exercise "imagination, thought, and perception" to associate the word with the nature of the services provided.[6]

73.     In the Defendant's response to the Trademark Office's Examining Attorney, the Defendant echo the Plaintiff's position in this Amended Complaint by stating:

> The length of time during and conditions under which there has been concurrent use without evidence of actual confusion is one of the thirteen ***DuPont*** factors to be considered in determining the likelihood of confusion. *In re DuPont de Nemours & Co.*, 476 F.2d 1357, 177 U.SP.Q. 563 (C.C.P.A. 1973). "[A]n absence of actual confusion, or a negligible amount of it, between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists. *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 27 U.S.P.Q. 2d 1460 (1st Cir. 1993), citing *Pignons S.A. v. Polaroid Corp.*, 657 F. 2d 482, 490 (1st Cir. 1981)(coexistence for four years) and *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 377 (1st Cir. 1980)(coexistence for three and one half years). [See Annex 3 page 4 to the Response]

74.     The Defendant had previously coexisted with the prior trademark registrant "in interstate commerce for approximately five years" before the Defendant applied for the trademark.  [See Annex 3 page 5 to the Response]

---

[6] *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) ([T]he more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trademarks will result in confusion concerning the source or sponsorship of the product.).

75.     The Plaintiff has operated for over six (6) years without one incident of confusion before the Defendant selectively decided to file its UDRP Complaint and selectively harass the Plaintiff.

76.     The services provided by Plaintiff and the Defendant are offered to different markets and are not in proximity and there is well established case law signifying these distinctions. *See Haven Capital Mgmt., Inc. v Havens Advisors, LLC*, 965 F.Supp. 525 (2d Cir. 1997) at 531-32 (finding that plaintiff, a company that provided investment advice and managed funds, and defendant, a company that provided advice and money management services, were not in competition because "the services that the parties render to their investors are significantly different")[7]; See Also *Beneficial Corp. v. Beneficial Capital Corp.,*529 F.Supp. 445, 449 (S.D.N.Y.1982) (finding that the plaintiffs, who advertised and made small loans to individual consumers served an "entirely different market" than defendant, who made large business loans for business purposes only)[8].

77.     As in *Haven* and *Beneficial,* the Plaintiff and the Defendant here are involved in "vastly different asset classes." *See Haven Capital Mgmt., Inc.,* 965 F.Supp. at 532 [See Annex 15 to the Response] whereby the Plaintiff has characterized its business as "providing direct investments in [*sic*] to small and micro-cap (market capitalizations under $50 million USD) publicly traded companies," (Annex 4 page 2 ¶4 to the Response) creating lack of proximity of the services provided by the parties favors the Plaintiff's position in the instant case.

78.     Defendant's activities towards Plaintiff constitute unfair competition under common law and Florida law.  Defendant's activities are unlawful, unfair and fraudulent; they constitute an illegitimate attempt to obtain Plaintiff's property

---

[7] See Annex 15 to the Response.

[8] See Annex 16 of the Response.

without just compensation, and an illegitimate attempt to enforce trademark rights far beyond any reasonable interpretation of same.

79.    These activities are unlawful, unfair and fraudulent insofar as third parties may believe Defendant's assertions, and Plaintiff's reputation and business is likely to suffer accordingly.

80.    Defendant's activities are unlawful, unfair and fraudulent; they constitute an illegitimate attempt to tortuously interfere with existing business relationships.

81.    Moreover, these activities cast a legal cloud on Plaintiff's title to his valuable Domain Names property, rendering such property more difficult if not impossible to use or realize its full market value, and thus effectively disabling such property. This obviously causes economic harm to the Plaintiff.

82.    Plaintiff reasonably believes that his registration and use of the Domain Names was and is lawful under the Lanham Act.

## COUNT I
## (Declaratory Relief)

83.    Plaintiff incorporates by reference and realleges each and every allegation he has set forth above, as though fully set forth herein.

84.    There is an actual and justiciable case or present controversy between the parties of sufficient immediacy and reality to warrant declaratory relief.

85.    Plaintiff rightfully registered and has used the Domain Name in good faith and neither had any knowledge of Defendant's claimed exclusive rights in the term "bridgewater" for services described, nor any intent to sell the Domain Names specifically to Defendant. Plaintiff had no intention of diverting any traffic from Defendant's website and avers that there is no evidence that such has occurred.

86.    In registering the Domain Names, Plaintiff had a legitimate interest in

the inherent, generic value of the Domain Names and has used the Domain Names consistently with such purpose.

87.    Defendant has asserted rights in the Domain Name's family of registrations are not exclusive and the Defendant does not have the exclusive right to the use of the term "bridgewater" as a trademark for the broad field of financial services.

88.    Plaintiff believed and had reasonable grounds to believe, as well as prior legal decisions and decisions under the UDRP and the ACPA (and their predecessor case law, to the extent any existed in 1995), that the registration and use of the Domain Names as a generic term and in connection with non-infringing related business endeavors was lawful.

89.    For approximately six (6) years, Plaintiff has had quiet enjoyment of his property in good faith, never hearing any complaint from Defendant or anyone else about her ownership of the Domain Names.

90.    The Defendant cannot use their contrary positions both before the United States Trademark Office and before the Center as both a sword and a shield.  The Defendant has previously argued no confusion and no bad faith in defense of their own trademark registration and then argues the opposite in before the Center when facts and circumstances are apposite to their own.  These acts by the Complainant constitute a lack of candor and bad faith on the Complainant's behalf.  Furthermore, the Defendant should also be barred from making any claim under the doctrine of judicial estoppel.

91.    Defendant filed the UDRP Complaint in bad faith, contending that Plaintiff registered and used the Domain Names in bad faith when the Defendant presented contradictory positions before various agencies.

92.    The UDRP provides that administrative panel decisions may be stayed, and that subject domain name disputes may be resolved in a court of

Page **17** of **25**

competent jurisdiction - regardless of the UDRP panelists' findings. The Federal Courts have held that any such review is to be made, *de novo*.

93.     .A justifiable controversy exists between the Plaintiff and the Defendant and to resolve this actual controversy, Plaintiff seeks a declaration and judgment that its registration and use of the Domain Name is with the legitimate interest of exploiting its inherent value, and/or is consistent with documented legitimate business efforts, and constitutes good faith use. Plaintiff seeks to remove the legal cloud over title to Plaintiff's valuable property, which has been created by Defendant's actions.

94.     Pursuant to 15 U.S.C. § 1119, "[i]n any action involving a registered mark the court may… order the cancellation of registrations, in whole or in part…and otherwise rectify the register with respect to the registrations of any party to the action."

95.     Based on the forgoing, when this Honorable Court enters an order for declaratory judgment in favor of the Plaintiff, Plaintiff  is entitled to an order pursuant to 15 U.S.C. § 1119 directing the Director of the Trademark Office to cancel U.S. Registrations Nos. 2395503 and 3302018.

96.     WHEREFORE, Plaintiff demands judgment against Defendant as set forth in the Prayer for Relief.

## COUNT II
### (Declaration of Non-Infringement
### Of Plaintiff's Rights Under Florida Law)

97.     Plaintiff incorporates by reference and realleges each and every allegation he has set forth above, as though fully set forth herein.

98.     There is an actual and justiciable case or present controversy between the parties as a result of Defendant's allegations that Plaintiff's use of the

"bridgewater" mark infringes on the rights of the Defendant's claim to one in the same mark and name for different and unrelated services.

99.    Plaintiff does not infringe, and at all times has not infringed, any trademark, trade name or domain name rights, if any, Defendant own under Florida law by Plaintiff's offering and plans to operate a hedge fund under the "bridgewater" mark.  Plaintiff is therefore entitled to a declaration under the Florida declaratory judgment statute, Fla. Stat. §§86.011 and 86.021, that Plaintiff's use and planned continued use of "bridgewater" mark does not violate any putative rights Defendant owns under Florida law.

100.    WHEREFORE, Plaintiff demands judgment against Defendant as set forth in the Prayer for Relief.

## COUNT III

### (Anti-Cybersquatting Prevention Act)

101.    Plaintiff incorporates by reference and realleges each and every allegation he has set forth above, as though fully set forth herein.

102.    Based on the foregoing allegations, there exists between the parties a substantial controversy of sufficient immediacy and reality to warrant declaratory relief.

103.    Plaintiff believed and had reasonable grounds to believe, as well as prior legal decisions and decisions under the UDRP and the ACPA (and their predecessor case law, to the extent any existed in 1995), that the registration and use of the Domain Names as a generic term and in connection with non-infringing related business endeavors was lawful.

104.    For approximately six (6) years, Plaintiff has had quiet enjoyment of his property in good faith, never hearing any complaint from Defendant or anyone else about her ownership of the Domain Names.

105.   Defendant is barred from making any claim under the doctrine of laches and the Defendant acquiesced the use of the mark "bridgewater" for approximately six (6) years.

106.   The Defendant cannot use their contrary positions both before the United States Trademark Office and before the Center as both a sword and a shield.  The Defendant has previously argued no confusion and no bad faith in defense of their own trademark registration and then argues the opposite in before the Center when facts and circumstances are apposite to their own.  These acts by the Complainant constitute a lack of candor and bad faith on the Complainant's behalf.

107.   Defendant's motivation in demanding the transfer of the Domain Names was not to protect its trademark. Instead, Defendant's conduct amounts to "reverse domain name hijacking" intended to stifle free enterprise.

108.   Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 that its use of the term "bridgewater" in connection with the TL Domains website, including the Transferred Domains and all related domain names, is protected under the First Amendment and the doctrine of nominative fair use and does not an infringe any trademark rights of Defendant.

109.   WHEREFORE, Plaintiff demands judgment against Defendant as set forth in the Prayer for Relief.

## COUNT IV
### (Tortious interference with Contract)

110.   Plaintiff incorporates by reference and realleges each and every allegation he has set forth above, as though fully set forth herein.

111.   Defendant published false statements to JP Morgan and other individuals regarding the Plaintiff and the Fund.

Page **20** of **25**

112.   Defendant knowingly, intentionally and/or maliciously publicized these false statements on the World Wide Web and to individuals or entities in this judicial district.

113.   Said false and defamatory statements were made with malicious intent to injure, including Plaintiff's and the Fund's reputation.

114.   Said statements were intended to, and did, intentionally interfere with Plaintiff's and the Fund's business relationship with JP Morgan.

115.   As a direct and proximate result of Defendant's conduct, JP Morgan shut down the Fund's bank account thereby the Plaintiff and the Fund has suffered, and will continue to suffer, substantial loss and damages.

116.   WHEREFORE, Plaintiff demands judgment against Defendant as set forth in the Prayer for Relief.


## COUNT V

### (Injurious Falsehood)

117.   Plaintiff incorporates by reference and realleges each and every allegation he has set forth above, as though fully set forth herein.

118.   Defendant published false statements to JP Morgan and other individuals regarding the Plaintiff and the Fund.

119.   Defendant knowingly, intentionally and/or maliciously publicized these false statements on the World Wide Web and to individuals or entities in this judicial district.

120.   Said false and defamatory statements were made with malicious intent to injure, including Plaintiff's and the Fund's reputation.

121.   Said statements were intended to, and did, intentionally interfere with Plaintiff's and the Fund's economic relations with JP Morgan.

122.   As a direct and proximate result of Defendant's conduct, JP Morgan

COURT_BWC #2015-0220 – FIRST AMENDED COMPLAINT

shut down the Plaintiff's Fund's bank account thereby the Plaintiff has suffered, and will continue to suffer, substantial loss and damages.

123.   WHEREFORE, Plaintiff demands judgment against Defendant as set forth in the Prayer for Relief.


## COUNT VI

### (Defamation)

124.   Plaintiff incorporates by reference and realleges each and every allegation he has set forth above, as though fully set forth herein.

125.   Defendant published false statements to JP Morgan and other individuals regarding the Plaintiff.

126.   Defendant knowingly, intentionally and/or maliciously publicized these false statements on the World Wide Web and to individuals or entities in this judicial district.

127.   Said false and defamatory statements were made with malicious intent to injure, including Plaintiff's reputation.

128.   Said statements were intended to, and did, intentionally interfere with Plaintiff's reputation.

129.   As a direct and proximate result of Defendant's conduct, JP Morgan shut down the Fund's bank account thereby the Plaintiff has suffered, and will continue to suffer, substantial loss and damages.

130.   WHEREFORE, Plaintiff demands judgment against Defendant as set forth in the Prayer for Relief.


## COUNT VII

### (Unjust Enrichment/Restitution)

131.   Plaintiff incorporates by reference and realleges each and every

allegation he has set forth above, as though fully set forth herein.

132.   Since the proceeding before WIPO, the Plaintiff has conferred a benefit on to the Defendant, namely the Transferred Domains.

133.   Since the proceeding before WIPO, the Defendant has knowledge of and acknowledged receipt of the Transferred Domains.

134.   Defendant initiated an UDRP Complaint against the Plaintiff that was false, misleading, inaccurate and/or fraudulent causing the Transferred Domains to be transferred to the Defendant.

135.   The arbitration panel was mistaken by applying the incorrect law and the retention of the Transferred Domains by the Defendant would be inequitable.

136.   This Honorable Court is empowered to review and correct any decision made by the inferior proceeding before WIPO.

137.   Plaintiff is entitled to recover from Defendant, who was unjustly enriched, the Transferred Domains.

138.   WHEREFORE, Plaintiff demands judgment against Defendant as set forth in the Prayer for Relief.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all issues so triable.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully requests the Court to enter a judgment as follows:

(a)   a declaration that Plaintiff has not infringed and is not infringing the trademark rights of Defendant including in the domain name, does not violate the Lanham Act, 15 U.S.C. § 1125;;

(b)      an award of costs and fees to Plaintiff pursuant to 15 U .S.1 114(2)(D)(IV);

(c)      an order pursuant to 15 U.S.C. § 1119, directing the Commissioner of Patents and Trademarks to cancel U.S. Trademark Registrations Nos. 2395503 and 3302018;

(d)      a declaration that Plaintiff has not violated and is not violating unfair competition law;

(e)      a declaration that Plaintiff has not violated and is not violating the ACPA;

(f)      a declaration that Plaintiff registered and has used the Domain Name in good faith and is the rightful registrant of the Domain Name;

(g)      restitution in the form of returning the Transferred Domains rightful ownership back to the Plaintiff;

(h)      declare that Defendant have violated the laws of the State of Florida, as set forth herein;

(i)      a judgment be entered in favor of the Plaintiff against all Defendant jointly and severally, for an amount exceeding $75,000.00, for compensatory damages, consequential damages, exemplary damages, punitive damages, treble damages, statutory damages, interest, costs, attorneys' fees (if any) and such other relief as the court shall find just and equitable and warranted by applicable law;

(j)      award lost and future profits;

(k)      grant Plaintiff equitable relief, permanently enjoining Defendant from further abuses against Plaintiff;

(l)      a finding awarding Plaintiff monetary compensation for damages sustained by Defendant's wrongful actions as alleged in this Complaint;

(m)      For costs, attorney fees (if any) and expenses pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. §1117(a), and Fla. Stat. §501.2105; and

COURT_BWC #2015-0220 – FIRST AMENDED COMPLAINT

(n)    such other and further relief as the Court may deem just and proper under the circumstances.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this __27th__ day of February, 2015, I manually filed the foregoing document with the Clerk of Court pursuant to the applicable Administrative Procedures.  I certify that a true and correct copy of the foregoing is being served this day by e-mail to Defendant's counsel to accept service on the Defendant's behalf.  I certify that a true and correct copy of the foregoing is being served this day via transmissions of Notices of Electronic Filing generated by CM/ECF.

Eric Noveshen, *Pro Se*
436 NE 10th Ave
Fort Lauderdale, FL  33301
Telephone:  (954) 525-6215
Facsimile:  (954) 337-7669
eric@bridgewaterfund.com

_____
BY: ERIC NOVESHEN